[Civ. No. 14899. Second Dist., Div. One. Jan. 28, 1946.]

SOUTHWESTERN INVESTMENT CORPORATION (a Corporation), Appellant, v. CITY OF LOS ANGELES, Respondent.

James R. Jaffray and Don Lake for Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones and Roger Arnebergh, Assistants City Attorney, for Respondent.

DORAN, J.—The plaintiff has appealed from an adverse judgment in an action seeking to establish a trust for dumping rights on a portion of certain real estate acquired by the city of Los Angeles, known as the Blue Diamond Pit and located at Washington Boulevard and Alameda Street in said city. On May 13, 1927, the plaintiff acquired from the owner, Henry G. Weyse, an exclusive leasehold right to use the pit for dumping purposes until the same should be filled, paying therefore a royalty of 50 per cent of all dumping fees received by plaintiff from third persons. On November 22, 1929, for a consideration of $175,000 Weyse deeded to the city a 90-foot right of way across the pit for the purpose of extending Washington Boulevard, the plan then being to build a trestle over the excavation. This plan was later abandoned and the city decided to extend the boulevard by filling in the 90-foot right of way across the pit.

The city, on February 11, 1931, acquired from Henry G. Weyse an easement for a roadway around the southerly side of the pit, to be used as a temporary extension of Washington Boulevard. The agreement covering this easement contained a provision that Weyse would be relieved of "any liability arising from the use of said temporary road by the party of the second part" (the city). In March, 1933, soon after this temporary road had been opened to the public, two men, Benjamin Heaton and Walter Brown, riding in an automobile, drove into the pit and were killed. In a death action by Heaton's widow there was a judgment against Weyse for $10,000, and on execution sale the pit property was bid in by the widow for $10,000. An action by Brown's administrator was also pending at this time, but was not brought on for trial. The question was then presented as to the city's liability to Weyse under the indemnity agreement hereinbefore mentioned which relieved Weyse from "liability arising from the use of said temporary road." It was suggested that this liability

might not be measured by the amount of the judgment against Weyse, but by the value of the pit property which Weyse might lose as a result of the execution sale, estimated at upward of $200,000.

"In the latter part of the year 1934," quoting from the Settled Statement on Appeal, "one Clay McCarty made an offer to the City through the Board, which would primarily, relieve the City of such possible liability by the means of the City purchasing, for a consideration of $25,000, the right to fill the space in the 90-foot right-of-way and necessary slopes across the Pit. . . . As additional benefits to the City, the purchase of these rights at this time would enable the Heaton judgment to be paid, and the Brown case to be compromised." On March 12, 1935, the city council adopted a resolution accepting the above offer on certain conditions. These conditions included a requirement that in place of the above mentioned right to fill in the 90-foot right of way, the city be granted a fee title "to approximately nine acres of real property adjoining the 90-foot right-of-way," which title, however, should revert to H. G. Weyse when the total area of the pit was brought to the grade of Washington Boulevard. In addition to this grant deed from Weyse, the city demanded a quitclaim deed from the Southwestern Investment Corporation and its president, "conveying all their rights in and under the 90-foot right of way and the nine acres to be conveyed by H. G. Weyse," and a release "of all dumping rights within the 90-foot right of way owned by the City across the Pit." Upon the vesting of title in the city the city real estate agent was directed to secure from the board of supervisors of the county, a cancellation of all delinquent taxes against the property, amounting to more than $32,000. A letter report from Commissioner of Public Works Allan to the city council, dated October 24, 1934, recommending acceptance of the McCarty offer, says nothing about appellant retaining any dumping rights, but suggests that the city secure a deed or release from appellant "concurring in this transaction," and states that "This would give the City complete jurisdiction of the pit of approximately 400 feet wide, including the present Right of Way owned by the City, *and the sole right to fill the pit.* . . ." (Italics added.)

Pursuant to the proposed settlement an escrow was opened on March 14, 1935, and on April 16, 1935, new escrow instruc-

tions were filed which increased the acreage to about 12 acres, covering all of the property north of the temporary roadway. Appellant's contentions are, in part, based upon a letter of April 17, 1935, from the Board of Public Works, stating that the board "hereby consents" to appellant filling a portion of Parcel C included in the escrow. The record fails to disclose any authorization, ratification, or other action by the city council in reference to this letter.

A quitclaim deed containing no reservations or exceptions and covering the 12.09 acres contemplated by the amended escrow instructions, was presented to appellant in April, 1935, signed by Southwestern on September 23, 1935, and deposited in escrow on October 29, 1935. Accompanying this quitclaim deed were instructions by Southwestern that the same should be used when the escrow agent could hold for Southwestern the sum of $8,500 together with "a duly authorized letter from the Board directed to the Southwestern setting forth the right of the Southwestern to proceed with its filling operations on the property described in the inclosed quitclaim deed." On November 5, 1935, the Southwestern Investment Corporation modified the above instructions as follows: "That portion of the instructions dated October 29, 1935, wherein the undersigned called for a letter from the Board of Public Works . . . setting forth the rights of the parties to proceed with their filling operations on the property described in the Quitclaim Deed, *are hereby cancelled and no such letter is to be placed in this escrow.*" (Italics added.) The following day, November 6, 1935, Southwestern gave to the escrow agent final instructions reading: "This Quitclaim Deed you are authorized to use in connection with your escrow only when you can comply with the instructions of the undersigned dated October 29, 1935, which instructions authorized the delivery of a Quitclaim Deed when you could collect for the account of Southwestern Investment Corporation and/or C. C. Bigelow the sum of $8500.00 in cash. The Quitclaim Deed handed you herewith is under no circumstances to be used unless you can comply with said demand of October 29, 1935." The requirement contained in the original escrow instructions of October 29, 1935, that a letter should be furnished by the board confirming Southwestern's dumping rights, is marked "Waived," such notation presumably being made by the escrow agent pursuant to Southwestern's amended instructions of November 5, 1935. On November 7,

1935, the escrow was closed, the deeds deliverd to the city and the $25,000 paid over, of which Southwestern and its assignee received $8,500. The deeds were formally accepted by the city council on November 26, 1935.

Following the close of the escrow by which the city acquired a fee title to the Blue Diamond Pit, the Board of Public Works, under date of December 18, 1935, wrote a letter to appellant and its president stating that the city had acquired all of such pit and that the board "consents to the Southwestern Investment Corporation filling to the grade of Washington Boulevard, . . . that portion of Parcel 'C' . . . lying southerly 150 feet south of the south line of Washington Boulevard," etc. Again it may be noted that no authorization, ratification or other action by the city council in reference to the consent embodied in such letter, appears of record. On December 27, 1935, President C. C. Bigelow of Southwestern wrote to appellant's attorneys that "The letter referred to above is not at all satisfactory, and does not state the terms of the agreement, upon which we finally consented to deposit our quit-claim deed in Escrow." President Bigelow further stated that prior to April 1, 1935, city representatives had called at the pit and that "I told these four representatives . . . that we did not want to quit-claim our rights without having our new rights under the city ownership thoroughly covered by a contract between the City of Los Angeles and our Corporation. *Mr. Allan* (Commissioner of Public Works) *explained that the Board of Public Works could not enter into a contract without authority from the City Council,* but that the Board of Public Works could and would give us a letter, after the city had acquired title, which would be better than any contract. . . ." (Italics added.) The letter also mentions an action by Weyse, the owner, to cancel appellant's lease, certain conferences in September, 1935, and affirms that "Soon after Mr. Weyse's assurance that the Board of Public Works would give us a letter, worded as we wanted it, we deposited our deeds in the above escrow and about two months afterwards . . . the escrow was closed." This letter was sent to the city real estate agent by appellant's attorneys, and on the letter of transmittal is found the following notation in the handwriting of Commissioner of Public Works Robert M. Allan: "There is very little truth in this letter."

Six months later, on June 10, 1936, the city, relying on the

fee title conveyed by the deeds from Weyse and Southwestern, evicted appellant from the pit. Not until December 18, 1938, however, did the appellant institute the present action or any action to protect its alleged dumping rights. After various delays the case was finally tried before a judge sitting without a jury on August 20, 1940, and a judgment rendered against the appellant. A new trial was granted, and on August 24, 1944, after a trial before another judge, a judgment was again entered against the appellant from which judgment the present appeal is prosecuted.

In the language of appellant's brief, "The Southwestern claims that, notwithstanding such quitclaim deeds, only the space needed for such street extension was bought, paid for and acquired by the City, and that possession of the rest of the Pit should be returned." The apparent basis for this claim is found in the amended complaint which alleges: "For the purpose of obtaining a cancellation of the taxes upon the ground under said pit, defendant (the city) requested and obtained a quitclaim of the title to said pit, to be held temporarily and until such cancellation of taxes was obtained, and then to be returned to its maker (appellant)." The prayer is for judgment that "the inclusion of the title to so much of said pit as is not included in the volume requisite to support said street across said pit, be held in trust for plaintiff," that possession of the pit to that extent be restored to plaintiff, and that judgment be awarded for the reasonable value of such portion of the pit used by the city.

The findings of fact were, in substance, that the city had acquired a fee title and all rights of ownership and possession in and to the pit; that there was no fraud, and that appellant's quitclaim deeds were given "for a full and fair consideration." The conclusions of law were that the cause of action was barred by laches, and that appellant was "estopped to deny the terms and provisions of said quitclaim deeds."

The appeal in this case is presented upon what is denominated a "Settled Statement on Appeal," which is of doubtful compliance with the Rules on Appeal, containing, as pointed out by the respondent, "a running statement against the judgment." Nevertheless, the appeal has been considered on its merits, and the voluminous exhibits accompanying the record examined in detail.

Appellant's "Point One on Appeal" is that the findings of fact and conclusions of law adverse to its contentions,

"are not justified by the law and the evidence." At the outset, however, as said by the reviewing court in *Miller* v. *Pacific Freight Lines,* 40 Cal.App.2d 451, 453 [104 P.2d 1069], "we are confronted with the well-established rule that all presumptions, intendments and inferences are in favor of the judgment of the trial court and all conflicts and discrepancies in the evidence must be resolved on appeal in support of the trial court. Where there is substantial evidence directly or indirectly tending to support the findings of the trial court, the judgment must be affirmed." That such substantial evidence tending to support the judgment exists in the instant case, there can be no doubt. It is, in fact, difficult to see how any court could arrive at a conclusion different from that reflected by the similar judgments rendered in the two trials of this action.

As said in the respondent's brief: "The deeds by which title to this property passed to the City of Los Angeles speak for themselves; they are clear and unambiguous." "Fraud," according to appellant's own statement, "is not an issue in this case." Nor can any doubt exist that appellant at all times knew exactly what was taking place and recognized the legal effect of its deeds, for it was represented by able counsel. C. C. Bigelow, the president of Southwestern, testified that *"he did not set up any reservation of dumping rights in the quitclaim deed, and that he was acting on the advice of counsel."* (Italics added.) Moreover, the pleadings contain no allegation of mistake, nor does the prayer of the complaint seek cancellation or reformation of the instruments in question. In view of this situation and the above evidence considered in connection with the entire record, the conclusion of the trial court that appellant "is estopped to deny the terms and provisions of said quitclaim deeds," finds ample justification.

 The claim that a trust should be declared for the purpose of protecting appellant's alleged dumping rights in the pit, is based upon certain representations and negotiations prior to execution of the deeds by Southwestern. However, such negotiations were had, not with the city council which had authorized the purchase, but with the Board of Public Works, Commissioner Allan of such board, and the City Engineer. In this respect the case is not unlike *Thomas Kelly & Sons, Inc.* v. *City of Los Angeles,* 6 Cal.App.2d 539, 543 [45 P.2d 223], where the court said: "The generous declara-

tion of the city engineer, who was not authorized to contract for the city, to the effect that because of hardship encountered plaintiff should be paid more than the contract provided, could not be construed as binding upon the city." The record is entirely silent concerning any authorization or ratification by the city council of the alleged understanding that appellant should be permitted to continue its pit operations. Moreover, appellant's President Bigelow wrote that Commissioner Allan had advised that "the Board of Public Works could not enter into a contract without authority from the City Council." Likewise, Robert F. Witter, City Real Estate Agent, gave similar advice in July, 1935, stating that the escrow instructions could not be amended so as to permit Southwestern to retain its dumping rights without action by the city council. In the face of these definite statements, appellant saw fit to give to the city absolute deeds containing no reservations of any rights whatsoever.

In *Resh* v. *Pillsbury*, 12 Cal.App.2d 226, 229 [55 P.2d 264], the court said: "We see no escape from the conclusion that the entire title to these properties passed upon the execution and delivery of these deeds. . . . The oral agreement that during her lifetime the grantor should retain the rents and profits from the properties was merged in the written instruments and was nullified thereby (Civ. Code, sec. 1625; Code Civ. Proc., sec. 1856). Evidence of the oral agreement was not admissible under these circumstances for the purpose of changing the effect of the deeds." In that case, as in this, the plaintiff sought to avoid the effect of the above rules of law by seeking to impress a trust upon the property. Again, in *Johnson* v. *Ware*, 58 Cal.App.2d 204, 206 [136 P.2d 101], the court held that the rule against defeating the clear and unambiguous provisions of a deed applied even where there is "an inconsistent provision in a contract of purchase pursuant to which the deed was given," and that in the absence of a reformation of the deed, the nature of the title acquired "was determined by the language in the deed and not by the statements in the agreement of purchase."

The appellant contends that the communications from the Board of Public Works hereinbefore mentioned, consenting that Southwestern should continue its dumping activities, were contemporaneous writings which "should be read with the deed from the grantor (Southwestern), and the two must be held to constitute one instrument," citing such cases as

*Patterson* v. *Donner,* 48 Cal. 369; *Janes* v. *Throckmorton,* 57 Cal. 368; *Younger* v. *Moore,* 155 Cal. 767 [103 P. 221], and *Sledge* v. *Stoltz,* 41 Cal.App. 209 [182 P. 340]. While it is doubtless true, as stated in the Patterson case, that where at the time of execution of a deed the grantee executes an instrument in the nature of a defeasance, the two must be read as one instrument, none of the cases cited bear any resemblance to the present situation and such cases do not support the appellant's claim. Nor is the quotation from *Downing* v. *Rademacher,* 133 Cal. 220, 224 [65 P. 385, 85 Am.St.Rep. 160], that ''As between the parties . . . there is no such magic in a conveyance of a title in fee which can be used to do an owner out of his property,'' of any material assistance.

■ The appellant insists that the quitclaim deeds in question were delivered to the city solely ''for the purpose of obtaining a cancellation of taxes upon the ground under said pit . . . to be held (by the city) temporarily and until such cancellation of taxes was obtained, and then to be returned to its maker (appellant).'' Just why either the city or the appellant should enter into such an obviously fraudulent arrangement, for the purpose of evading taxation, is not explained, nor does the evidence justify such a conclusion. The right of the city to secure a cancellation of the delinquent taxes on the pit property acquired by it from the owner Weyse, which conveyance was concurred in by appllant's quitclaim deeds, was sustained in *City of Los Angeles* v. *Ford,* 12 Cal.2d 407 [84 P.2d 1042]. It is true, as stated by appellant, that Southwestern was not a party to that case. The existence of such litigation does not, however, as appellant seems to infer, provide any corroboration of the contention that the quitclaim deeds were delivered solely for the questionable purpose of having the delinquent taxes cancelled, and that thereafter such deeds were to be invalidated. There is nothing of record in the instant case which in any manner tends to rebut the presumption that ''private transactions have been fair and regular,'' (Code Civ. Proc., § 1963(19)), or the corresponding presumption that ''official duty has been regularly performed,'' (Code Civ. Proc., § 1963(15)).

The delivery of the quitclaim deeds in question appears to have been regularly effected through the usual instrumentality of an escrow. Appellant's amended complaint, upon which the case was tried, contains no atack upon this escrow or the

conduct of the escrow agent. On appeal, however, the appellant affirms that "the record shows that the escrow agent delivered Southwestern's deeds to the (City) Real Estate Agent, regardless of Southwestern's escrow instructions of October 29 and November 6, 1935." This point was not an issue in the court below, but even if reviewable, appellant's contention ignores the modified escrow instructions of November 5, 1935, and the exhibits and other evidence indicate that the point is untenable.

Appellant complains of the trial court's finding that the quitclaim deeds were executed and delivered to the city "for a full and fair consideration." It is argued that the $8,500 received by Southwestern and its assignee pursuant to the escrow instructions, was a mere "pittance" amounting to such a "gross inadequacy of consideration" as to shock the conscience and justify rescission. In support of this argument appellant affirms that the value of the entire pit is at least $655,000. Two things must be noted, however, in connection with the contention; first, that appellant's action was not for rescission and cancellation of the deeds, nor for reformation of the instruments; and second, that appellant never owned any part of the pit, its sole right being a leasehold dumping privilege. And, as hereinbefore mentioned, neither fraud nor mistake is an issue in this case.

In reference to the adequacy of consideration respondent calls attention to the fact that the pit property had been sold to the state for taxes, which with penalties amounted to over $32,000, and that apparently neither Weyse the owner, nor Southwestern the lessee, had funds available to redeem the property. "Moreover," continues the respondent's brief, "an action was pending . . . to cancel plaintiff's lease . . . (Def. Exh. E.). It is thus seen that, instead of plaintiff's leasehold interest being wiped out under a tax sale, or by possible judgment cancelling plaintiff's lease, plaintiff received $8,500 for quitclaiming its rights, whatever they were." That appellant and its attorneys had weighed these possibilities, cannot well be doubted. The court's finding that there was a full and fair consideration, was fully justified. There is, therefore, no merit in the contention that the transaction violated Amendment V to the Constitution of the United States, and article I, section 14 of the California Constitution, which prohibit the taking of private property for public use without just compensation.

The trial court's conclusion that plaintiff's action was barred by laches, is assailed as not justified by the findings and evidence. However, it is to be noted that the evidence showed and the court found that there was a delay of more than three years between the delivery of the quitclaim deeds and the filing of the appellant's action, and the conclusion that laches existed, appears to be justified. The question of laches is however quite immaterial, since the same result, adverse to appellant's claims, must have been arrived at even if the action had been filed immediately after appellant's eviction from the pit.

Appellant's criticism of the other findings of fact and conclusions of law is likewise without merit, as is the contention that the court failed to find upon material issues.

For the foregoing reasons the judgment is affirmed.

York, P. J., and White, J., concurred.

A petition for a rehearing was denied February 14, 1946, and appellant's petition for a hearing by the Supreme Court was denied March 28, 1946.